UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 12-20385 |
| Plaintiff, | Linda V. Parker |
| v. | United States District Judge |
| SAMUEL DUANE JOHNSON, JR., | Michael Hluchaniuk |
| | United States Magistrate Judge |
| Defendant. | |
| _____/ | |

**REPORT AND RECOMMENDATION**
**DEFENDANT'S MOTION TO SUPPRESS (Dkt. 18)**

**Procedural History**

Defendant Samuel Duane Johnson, Jr. was indicted in the Eastern District of Michigan on June 6, 2012, and charged with possessing a firearm on May 25, 2012, after having been convicted of a felony offense. (Dkt. 1). He was arrested in Texas and appeared before a magistrate judge on July 26, 2012, in Texas, before being transferred to the Eastern District of Michigan. (Dkt. 4). His arraignment in this district took place on August 23, 2012, and a detention hearing was held that day as well. An order of detention pending trial was entered on August 26, 2012. (Dkt. 7).

The present motion to suppress was filed on February 10, 2014. (Dkt. 18). The government responded to the motion on March 10, 2014. (Dkt. 23). The

motion was referred to the undersigned on May 5, 2014. (Dkt. 24).

Evidentiary hearings were held on May 15, 2014, and June 9, 2014. The parties requested the opportunity to file post-hearing briefs after a transcript of the hearing was prepared and that request was granted. The transcript of the hearing was filed on June 25, 2014. (Dkt. 26 and 27). The government's initial supplemental brief was filed on July 9, 2014. (Dkt. 28). Defendant responded to that brief on July 30, 2014 (Dkt. 30), and the government filed a reply on August 6, 2014. (Dkt. 31).

This matter is now ready for report and recommendation. For the reasons set forth below, the undersigned **RECOMMENDS** that defendant's motion to suppress be **DENIED.**

## Evidence

During the evidentiary hearing related to this motion, three witnesses testified over the course of two days. The first of those witnesses was Bradley Ross who has been a law enforcement officer with the Michigan Department of State Police for almost 16 years and is currently a sergeant. (Dkt. 26, Tr., 5/15/14, p. 8). In May of 2012, Sgt. Ross was assigned to the "Flint City Detail" and on May 25, 2012, he was the driver of a fully marked State Police patrol vehicle heading west on Cooper Street and noticed what turned out to be defendant's vehicle, a black SUV, "roll" through a stop sign at the intersection of Cooper

Street and Wisner Street in Flint. Defendant's vehicle was heading east on Cooper Street at the time and turned south onto Wisner Street at the intersection. (*Id.*, Tr. 5/15/14, p. 9). At some point Sgt. Ross' vehicle "passed" defendant's vehicle going in opposite directions on Cooper Street. *Id*. After making the observation of defendant's vehicle "rolling" through the stop sign, Sgt. Ross "turned [his] vehicle around on Cooper" Street such that he was heading east and then turned south on Wisner Street, following defendant's vehicle. (*Id.*, Tr. 5/15/14, pp. 9-10). Sgt. Ross "began to activate the emergency equipment" after the turn onto Wisner Street and he observed defendant's vehicle "roll" through a second intersection, this one at Wisner and Myrtle, which is also a "signed intersection." (*Id.*, Tr. 5/15/14, p. 10).

    Defendant's vehicle turned onto Myrtle and drove to a gas station at the corner of Myrtle and Clio Road and pulled next to the gas pumps. *Id*. Sgt. Ross pulled his vehicle directly behind defendant's vehicle at the gas pumps and approached the driver's side of defendant's vehicle. *Id*. Defendant was asked for his driver's license and he produced a Michigan identification card rather than a driver's license. Sgt. Ross directed defendant to get out of the vehicle and eventually defendant did, at which point Sgt. Ross observed the firearm on the floor of the vehicle close to the door opening. (*Id.*, Tr. 5/15/14, p. 11).

    On cross-examination, Sgt. Ross acknowledged that his testimony regarding

3

the color of defendant's vehicle was in error after reviewing his contemporaneous report which stated the color of the vehicle was silver. (*Id.*, Tr. 5/15/14, p. 21). He later stated that nothing else in the report, besides the color of the vehicle, was inconsistent with his hearing testimony. (*Id.*, Tr. 5/15/14, pp. 37-38).

Jason Walters was also a State Police Trooper who was riding with Sgt. Ross on May 25, 2012. (Dkt. 26, Tr. 5/15/14, p. 44). Tpr. Walters did not personally observe defendant's vehicle "roll" through the intersection of Cooper and Wisner, but did observe defendant's vehicle "roll" through the intersection of Wisner and Myrtle, after the emergency lights on the police vehicle were activated. (*Id., Tr*. 5/15/14, p. 46). Tpr. Walters could not recall their exact location when the defendant's vehicle was first observed, and could not rule out the possibility that their vehicle was stationary at the time. (*Id.*, Tr. 5/15/14, p. 51).

The first day of the hearing ended without concluding Tpr. Walters' testimony due to a request by the defense for certain documents to be produced which were unavailable at that time. The documents were produced and the hearing was continued on June 9, 2014. Tpr. Walters resumed his testimony on that date and, after reviewing a document he had not had at the May 15, 2014, hearing, he stated that he and Sgt. Ross had made 30 traffic stops that evening and the last stop before stopping defendant's vehicle ended three minutes prior to the

4

stop of defendant's vehicle. (Dkt. 27, Tr. 6/9/14, p. 20). Tpr. Walters did not recall exactly how they got behind defendant's vehicle but he did not believe they either "passed" defendant or made a "U-turn" to get behind him. (*Id.*, Tr. 6/9/14, p. 20). Tpr. Walter's testimony concluded the government's proofs in the hearing.

Defendant was the only witness to testify for the defense. He stated that on the night in question he had left work at a pizza place and dropped off a co-worker before heading home. (Dkt. 27, Tr. 6/9/14, pp. 24-25). He was driving with a "fake" driver's license because he did not have a valid license and he needed a license for his work. (*Id.*, Tr. 6/9/14, p. 25). His route home took him to Cooper Street where he stopped at the corner of Cooper and Wisner, facing east. (*Id.*, Tr. 6/9/14, p. 27). When he came to a stop at that intersection, he could see, ahead of him, a police vehicle parked on Kellar, the next street that intersected with Cooper Street. *Id*.

Defendant turned south on Wisner and at some point before coming to the next intersecting street he looked in his rearview mirror and saw the police vehicle behind him with its emergency lights on. (*Id.*, Tr. 6/9/14, p. 29). Rather than stopping immediately, defendant proceeded to the next intersection, stopped, and then turned right. After defendant turned right, he heard the siren on the police vehicle and he then turned into a gas station that was open at that time of night and pulled up to the pumps. *Id.* Defendant stated he did not stop when he first

observed the police vehicle with its lights on because the police in Flint "have a habit of beating people up" and the area he was in when the emergency lights were first observed was not well lit. However, the gas station where he did stop was well lit because it was open at that time. (*Id.*, Tr. 6/9/14, pp. 30-31).

## Legal Standards

The primary issue in this motion to suppress is whether the traffic stop of defendant on May 25, 2012, was proper. Defendant does not seek to challenge aspects of the circumstances following the traffic stop. Police officers are permitted to stop a motor vehicle if they have probable cause to believe that the driver of the vehicle has committed a civil infraction. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2007). "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *Id*. Neither side contends that a standard other than probable cause applies to the circumstances in which a police officer is properly able to stop a vehicle for a civil infraction.

A second issue relevant to the facts of this case is when, for Fourth Amendment purposes, a person is "seized" by a police officer. A person is "seized" under the Fourth Amendment when a police officer "arrests" the person. "An arrest requires *either* physical force ... *or*, where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991).

6

(emphasis in original) (subject not seized until tackled by police officer after chase). There is "no seizure without actual submission; otherwise, there is at most an attempted seizure." *Brendlin v. California*, 551 U.S. 249, 254 (2007). (passenger seized following traffic stop where passenger did not attempt to leave scene thereby demonstrating "passive acquiescence" to show of authority).

### Analysis and Conclusions

The defendant filed his motion to suppress arguing that there was no valid basis for the stop of his vehicle on May 25, 2012, because he had not committed a traffic violation, and therefore, the evidence that was seized following the stop should be suppressed and the charge dismissed. (Dkt. 18, Pg ID 73-75). The government's response to the motion to suppress contended that police officers observed defendant commit two traffic violations which provided probable cause that defendant had committed a civil infraction, and therefore the stop of defendant's vehicle was proper. (Dkt. 23, Pg ID 121).

In its post-hearing brief, the government stated that the evidence at the hearing demonstrated that defendant had committed two civil infractions, the first of which was observed by Sgt. Ross and the second of which was observed by both Sgt. Ross and Tpr. Walters. Either of these traffic violations provided a valid basis to stop defendant's vehicle and therefore the seizure of evidence following the stop was proper. The government recognized that defendant's testimony was

contrary to that of the officers regarding whether defendant actually stopped his vehicle at the stop signs, but the government contended that the testimony of the officers was more credible than that of the defendant as to that issue. Further, the government argued that even if the testimony was not as clear as to the circumstances of the first stop sign, the circumstances of the second stop sign were clear and would serve as an independent basis for the stop regardless of the situation relevant to the first stop. The government argues that the circumstances of the second stop sign could serve as an independent basis for the stop because defendant had not been "seized" as of that moment in that he had not yielded to the show of authority of the police. (Dkt. 28, Pg ID 244-45).

Defendant responded to the government's post-hearing brief, arguing that the testimony of Sgt. Ross and Tpr. Walters was inconsistent in several ways such that their testimony was not as credible as that of the defendant regarding whether he had actually stopped at the stop signs. Additionally, defendant argued that it did not matter whether had rolled through the second stop sign because he had already been "seized" by the officers due to the show of authority by the officers before the second stop sign event. According to defendant, the seizure by the officers was complete when the emergency lights were activated and defendant did not attempt to flee from the officers at that time. (Dkt. 30, Pg ID 264).

The government's reply to defendant's response was that while there might

have been some inconsistencies between the testimony of the officers, they were sufficiently credible such that their testimony regarding the defendant rolling through the stop signs should be credited. Also, the government contended that defendant had not submitted to the show of authority of the officers because he kept driving when the emergency lights were activated and therefore the second stop sign incident could be viewed as a separate, independent basis for the traffic stop. (Dkt. 31, Pg ID 275-77).

## The Cooper Wisner Incident

The resolution of this motion requires a finding of disputed facts by the Court. Under the circumstances, the credibility of the witnesses who testified at the evidentiary hearing must be determined. The credibility of witnesses is determined using the following factors: (1) the ability of the witness to see and hear the events; (2) the strength of the witness' memory; (3) whether something may have interfered with the witness' ability to perceive or remember the events; (4) the appearance of the witness while testifying; (5) whether the witness had a stake in the outcome of the case, any bias or prejudice, or any reason to lie or slant the testimony in favor of one side or the other; (6) whether the witness testified inconsistently and, if there was an inconsistency, whether the inconsistency was about something important, and; (7) how believable the witness' testimony was in light of all the other evidence. Sixth Circuit Pattern Jury Instructions, 2011

Edition, § 1.07. Additionally, the testimony of a law enforcement officer is not entitled to greater weight than other witnesses and is subject to attack on the grounds that the officer's testimony may be colored by a personal or professional interest in the outcome of the case. *United States v. Lopez-Medina*, 461 F.3d 724, 744 (6th Cir. 2006).

Sgt. Ross testified that he observed defendant roll through the stop sign at Cooper and Wisner while the police vehicle was driving in a westerly direction on Cooper Street. He further stated that after he made the observation, he had to turn the police vehicle around to get behind defendant's vehicle, at which point he activated the emergency lights on the police vehicle. Tpr. Walters testified that even though he was in the same vehicle as Sgt. Ross, he did not see defendant's vehicle roll through the stop sign. Tpr. Walters also was not sure when he had first observed defendant's vehicle, but he stated that they did not "pass" defendant's vehicle and did not have to make a "U turn" to get behind defendant's vehicle.

Defendant challenges the credibility of the officers by pointing out what are arguably inconsistencies in their respective testimony regarding the Cooper Wisner stop. The government contends these are minor inconsistencies and do not significantly impact the credibility of the officers.

One inconsistency mentioned by defendant was the fact that Sgt. Ross

observed defendant's vehicle roll through the Cooper-Wisner stop sign and Tpr. Walters did not, even though they were in the same vehicle. (Dkt. 30, Pg ID 258). The fact that two police officers might be in the same car and looking in different directions for the few seconds that it would take a vehicle to roll through a stop sign hardly seems surprising. This inconsistency does not reflect negatively on the credibility of the officers. The fact that Tpr. Walters does not corroborate Sgt. Ross as to this incident is less significant here in light of the fact that there was no evidence that corroborated defendant's testimony that he did stop at the stop sign.

A second alleged inconsistency is the difference between Sgt. Ross' testimony that they passed defendant's vehicle going in opposite directions and at some point Sgt. Ross stated they had to turn around on Cooper Street in order to get behind defendant, who was at that point going south on Wisner, and Tpr. Walter's testimony that they did not pass defendant's vehicle and did not make a "U turn" in order to get behind them. (Dkt. 30, Pg ID 258-59). Admittedly, this was a difference in the testimony of the two police officers. Sgt. Ross did not seem to have trouble recalling the incident whereas Tpr. Walters did. The fact that the officers would have different recollections of the incident is not a surprise and does not significantly undermine the testimony of the officers. As defendant has pointed out, these officers were making as many as 30 traffic stops a night, which would make it difficult to recall every detail of each stop. Sgt. Ross' testimony is

11

bolstered by the fact that, with the exception of the color of defendant's vehicle, Sgt. Ross' testimony was consistent with his report that was made shortly after the incident in question. (Dkt. 26, Tr. 5/15/14, pp. 37-38). Additionally, it seems unlikely that an officer would have to fabricate his testimony regarding the location he was in when he made the observation of defendant rolling through a stop sign.  Whether the vantage point was a stationary location a short distance from the Cooper-Wisner intersection or a moving position somewhere on Cooper Street would not seem to matter.

Another alleged inconsistency was whether Sgt. Ross obtained a copy of the incident report from Tpr. Walters.  Sgt. Ross stated, when asked how he obtained a copy of the incident report, that "Trooper Walters had a copy of the report." (Dkt. 26, Tr. 5/15/14, p. 19).  On the other hand, when Tpr. Walters was asked if he had given Sgt. Ross a copy of the incident report, he denied that he had done that and stated Sgt. Ross had obtained a copy of the report from the prosecutor. (*Id.*, Tr. 5/15/14, p. 52).  This is an apparent inconsistency, but not something that is of great significance in the overall proofs of the case.

Defendant argues that the testimony of the officers is "so contradictory ... that it cannot be considered sufficiently reliable to overcome Mr. Johnson's testimony that [he stopped at the Cooper-Wisner intersection]."  However, Mr. Johnson's testimony is not without challenge to his credibility.  The defendant

12

faces a custodial sentence if convicted, and the possibility of going to prison certainly provides a motive to fabricate. The defendant admitted to obtaining a "fake" driver's license in order to get a job. A person who would perpetrate a falsehood in order to obtain a job may be willing to perpetrate another falsehood to avoid going back to prison.

The government has the burden of proof to demonstrate that the stop of defendant's vehicle was based on probable cause that a civil traffic violation had been committed. The burden of proof in this regard is a preponderance of the evidence. The court concludes that the testimony of the officers, even with the inconsistencies pointed out by defendant, meets the preponderance of the evidence standard for establishing that probable existed that defendant had committed a civil infraction by not coming to a complete stop at Cooper and Wisner, and that a traffic stop of defendant's vehicle, based on that, was appropriate.

### Wisner-Myrtle Incident

The facts surrounding this incident are somewhat clearer than those regarding the Cooper-Wisner incident. In this situation, both officers were consistent with regard to what they say happened, and defendant does not argue otherwise. Sgt. Ross testified that when he pulled behind defendant's vehicle on Wisner Street, he activated his emergency lights but defendant did not stop. Tpr. Walters testified to the same set of facts. Sgt. Ross further stated that when

defendant "rolled" through stop sign at Wisner and Myrtle, and turned right on Myrtle, he turned his siren on. Defendant still did not stop, but proceeded to the gas station at Myrtle and Clio Road and pulled next to a gas pump.

Defendant generally agrees with this description of what happened, except that defendant claimed that he stopped at the stop sign at Wisner and Myrtle and did not roll through it. The same credibility issues that were applicable to the Cooper-Wisner situation are applicable here too, except that there is no inconsistency between the two police officers regarding relevant facts. Applying these factors to this situation results in the conclusion that the officers had probable cause to believe that defendant committed a civil infraction at the intersection of Wisner and Myrtle, and therefore the stop of defendant's vehicle was justified and appropriate.

Defendant argues that even if he did not completely stop at Wisner and Myrtle, that would not matter because he had already been "seized" for Fourth Amendment purposes when the officers turned on the emergency lights. Defendant contends that the activation of the emergency lights was a sufficient show of authority, when there is no flight following the show of authority, to find that defendant was seized at that point.

As noted above, the court finds that outside of an actual physical seizure by police, a person is not seized for Fourth Amendment purposes until a person

submits to the authority of the police following a show of authority. This standard is clearly articulated in the *Hodari D.* and *Brendlin* decisions noted earlier, and has been followed by decisions in the circuit. In *United States v. McCauley*, 548 F.3d 440, 443-44 (6th Cir. 2008), officers followed a vehicle with their emergency lights on but the vehicle did not stop. The vehicle pulled into a garage and the defendant went inside the house. The defendant later came outside the house when the officers were talking with another person. The court found that the defendant did not submit to the authority of the offices until he came outside the house and therefore no seizure took place until then. In *United States v. George*, 456 Fed.Appx. 530, 531-32 (6th Cir. 2012), police officers encountered two individuals on a street and ordered them to put their hands on the police car. One of the two people complied and the other did not. That second person walked around close to the police vehicle but did not leave the area and was ordered for the third time to put his hands on the car after the officer drew his weapon. The defendant dropped what turned out to be a handgun and then ran off. The court said there had been no seizure at the point where defendant dropped the gun because defendant had not submitted to the authority of the officer.

    While a number of the cases relating to when a person is seized for Fourth Amendment purposes involve flight by the suspect, none of those cases state that flight is a necessary predicate to the determination that a person has not submitted

to a show of authority. Defendant's attempts to distinguish *Hodari D.* from the present case are unsuccessful. While clearly there are factual differences between the two cases, the court unambiguously states that there is no seizure without physical restraint or submission to a show of authority. It is not just the show of authority that results in a seizure, as suggested by defendant. Another case cited by defendant was *United States v. Freeman*, 735 F.3d 92 (2d Cir. 2013). However, *Freeman* is no help to defendant. In that case, police approached an individual on the street and almost immediately physically restrained him. The court said seizure for Fourth Amendment purposes took place when the officers physically restrained the suspect. Nothing resembling that took place here prior to the time the defendant drove his vehicle to the gas station and stopped.

     The defendant was not "seized" at any time prior to the officers having contact with him in the gas station at Myrtle and Clio Road. As indicated above, a preponderance of the evidence establishes that defendant committed a civil infraction by not coming to a complete stop at Wisner and Myrtle, and therefore probable cause existed for the officers to believe that such an offense was committed. This incident is a separate, independent basis for the traffic stop that led to defendant's arrest and would validate the stop even if probable cause had not existed based solely on the events at Cooper and Wisner.

### Recommendation

Based on the above, it is respectfully **RECOMMENDED** that defendant's motion to suppress be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection

No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: September 5, 2014              s/Michael Hluchaniuk
                                     Michael Hluchaniuk
                                     United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on September 5, 2014, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: Jules DePorre and Glenn Simmington.

                                     s/Tammy Hallwood
                                     Case Manager
                                     (810) 341-7887
                                     tammy_hallwood@mied.uscourts.gov