UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,                    CASE NO. 4:12-20385

                   Plaintiff,

Vs.                                          JUDGE LINDA PARKER
                                             MAGISTRATE JUDGE
SAMUEL DUANE JOHNSON, JR.,                    MICHAEL HLUCHANIUK

                  Defendant,
_____

| | |
|---|---|
| JULES DEPORRE | GLENN M. SIMMINGTON P33626 |
| Asst. United States Attorney | Attorney for Defendant |
| Attorneys for Plaintiff | 503 S. Saginaw Street |
| 600 Church Street | Ste. 1000 |
| Flint, MI  48502 | Flint, MI  48502 |
| (810) 766-5031 | (810) 600-4211 |
| FAX:  (810) 766-5427 | FAX:  (810) 232-1079 |
| jules.deporre@usdoj.gov | simmingtonlaw@gmail.com |

_____

## DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION (Dkt. 33) REGARDING DEFENDANT'S MOTION SUPPRESS (DKT. 18)

Samuel Duane Johnson, Jr., by and through his attorney, Glenn M. Simmington, of the Law Office of Glenn M. Simmington, PLLC, in accordance with Fed. R. Civ. P. 72 (b) (2) and (3), and L.R. 72.1(d), hereby sets forth the following objections to the above-captioned Report and Recommendation, hereby also seeks review of the same by this Honorable Court, and in support states the following:

**Objection 1**. While acknowledging that "the resolution of [Defendant's] Motion require[d]" both "a finding of disputed facts" and an assessment of "the

**(relative) credibility of the witnesses," the Report and Recommendation then correctly _referenced_ the factors set forth in Sixth Circuit Pattern Instruction §1.07, but then erroneously failed to _apply_ those factors; as a consequence, the Report and Recommendation erroneously favored Tpr. Ross's testimony over that of the Defendant.**

At page 9 of the Report and Recommendation, the following passage appears:

### The Cooper Wisner Incident

The resolution of this motion requires a finding of disputed facts by the Court.  Under the circumstances, the credibility of the witnesses who testified at the evidentiary hearing must be determined.

Then, acknowledging that witness credibility assessments are properly to be made in this Circuit by utilizing the factors set forth in Sixth Circuit Pattern Instruction §1.07, the Report and Recommendation goes on to "analyze" the relative credibility of the hearing witnesses by _selectively_ applying these factors.   This approach is not explicit, (the Report and Recommendation, also at page 9,  _explicitly_ notes that "[t]he credibility of witnesses is determined using the [Pattern Instruction] factors"), but the balance of the Report and Recommendation simply declines to apply the factors it _implies_ as necessary to determine "the credibility of the witnesses who testified at the evidentiary hearing[.]"   As a consequence, the selective approach adopted by the Report and Recommendation amounts to an _erroneous_ approach which, "under the circumstances," (_Id_.), rendered an erroneous result.

2

## Analysis of Factors

While it must be conceded that a purely numerical approach to assessing the "credibility factors" set forth in the 6th Circuit Pattern Instruction is neither necessary, nor necessarily advisable, it would seem imperative that at least *some* attention should be given to all seven of those factors.   To that end, Defendant will address all seven, *seriatim.*

1.   <u>The ability of the witness to see and hear the events.</u>  Regarding this factor, Defendant submits that Tpr. Ross and the Defendant are "similarly situated," since neither professed during their hearing testimony any inability to see and hear the events comprising Defendant's response to the stop sign at the corner of Cooper and Wisner Streets.   Only Tpr. *Walters* testified that he "did not see" Mr. Johnson "roll through" that stop sign, (Report and Recommendation, page 10), and as the Report and Recommendation correctly points out, Tpr. Walters might reasonably have been unable to see what Tpr. Ross *claims* he saw — Defendant's failure to come to a complete stop — *if* he was looking in another direction.   The Report and Recommendation errs, however, by *assuming* Tpr. Walters was looking in a different direction, since Tpr. Walter's gave no testimony whatsoever to that effect.   Instead, and indeed, Tpr. Walter's testified it was his assigned job to be looking for traffic infractions at the time, (Dkt. 27, R. 6/9/14, p. 9), and there was no testimony from any witness that circumstances existed at the time that might have distracted him

3

from seeing what was, apparently, the only other vehicle at the intersection of Cooper
and Wisner Streets at the time.  According to the testimony of Tpr. Walters, (Dkt. 27,
Tr. 6/9/14, p. 17), it was 1:48 a.m., and the proofs taken at the hearing provided no
reason to suppose, as the Magistrate Judge was apparently willing to suppose, that
there was *any* other traffic present, on *either* Cooper Street *or* Wisner Street, that
*likely* distracted Tpr. Walter's attention at the time.

Thus, even though Tpr. Walters "[also did not corroborate] the Defendant's
testimony that he did stop at the stop sign," (Report and Recommendation, page 11),
the Report and Recommendation's treatment of the inconsistency between Tprs. Ross
and Walters' testimony on this point, (finding, at p. 11, that it did not "reflect
negatively" on Tpr. Ross's testimony), rests upon a "false equivalency:" Tpr.
Walters' was not assigned (presumably) the task of "looking for" drivers who were
*obeying* all traffic laws, but *was* tasked with observing all traffic, with an eye toward
identifying violators.

"On balance," therefore Tpr. Walters' inability to corroborate the testimony of
Tpr. Ross, that Defendant *did* roll through the stop sign at Cooper and Wisner Streets,
should properly have been considered far more significant to the Magistrate Judge's
"credibility assessment" of Tpr. Ross, than to the Magistrate Judge's assessment of
Defendant's credibility.

Given the traffic conditions, and in view of Tpr. Walters' acknowledged assignment at the time, if Mr. Johnson *did* roll through that stop sign, Tpr. Walters' inability to see him do so is explicable *only* by engaging in the *speculation* that he "might [have been] looking in [a] different direction [.]"   (Report and Recommendation, page 11.)   Tpr. Walters' did not so testify, nor did the proofs submitted at the hearing, taken as a whole, lend any support to the Report and Recommendation's supposition that Tpr. Walters' simply did not see what he had been placed on the road *to* see.

Mr. Johnson's position that he did not commit the civil infraction that Tpr. Ross *claims* he committed, in short, was *fully* consistent with all of the other proofs submitted, (see Pattern Instruction §1.07 [7]), whereas Tpr. Ross's contrary position was only *made consistent* with those proofs by the Magistrate Judge's pure *speculation* that Tprs. Ross and Walters' were "looking in different directions" when the infraction allegedly occurred.

Thus, the first factor set forth in Sixth Circuit Pattern Instruction §1.07 should have been "scored," and in Defendant's favor.   It was not so scored, and amounts, therefore, to both an erroneous oversight and an incorrect decision which this Court should rectify.

2.      **The strength of the witness' memory.**   The Defendant cannot permit himself the luxury of assuming that the relative strength of his memory regarding

5

"The Cooper Wisner Incident," (i.e., compared to the strength of Tpr. Ross's memory), "goes without saying."    Thus, the Defendant would emphasize that, whereas he had only one encounter with police authorities on the night in question, Tpr. Walters' testified that he and Tpr. Ross habitually had an average of 30 encounters *per night*, with City of Flint drivers, during their time as Michigan State Police patrol partners.  (Dkt. 27, Tr. 6/9/14, p. 14)  (The Report and Recommendation does acknowledge this at page 4.)

Moreover, as the Report and Recommendation also correctly acknowledged, the Troopers' reported patrol history "would make it difficult to recall every detail of each stop."  (Id., page 11.)

Rather than make the second factor of Sixth Circuit Pattern Instruction §1.07 a pertinent consideration, however, (much less to acknowledge that Defendant's credibility should be relatively "favored" on this factor), the Report and Recommendation actually excused Tpr. Walters' failure to corroborate this highly significant aspect of Tpr. Ross's claimed memory by attributing it to the fact that "[Tpr. Walters did] have trouble recalling the incident [,]" whereas "Tpr. Ross did not seem to [.]"  (Report and Recommendation, page 11.)

The specific inconsistency in question, it must be noted, did not involve an insignificant detail.  As was highlighted in Defendant's briefing on the suppression motion, (Dkt. 30, Defendant's Reply to Government's Supplemental Brief, pp. 6-7),

Trooper Ross's testimony that he "noticed," as he watched Mr. Johnson's vehicle "pass," that "[i]t had rolled through that stop sign [at Cooper and Wisner]," (Dkt. 26, 5/15/14, pp. 9-10), if true, meant that Defendant's vehicle was *either* within a few feet of the Trooper's vehicle, *or* had immediately passed it, so that Trooper Ross's claimed observation was made in the rearview mirror.   Either way, Defendant could not have been unaware that he was being directly observed, from a few feet away, by officers driving a marked patrol car, when he simply "rolled through" a stop sign!

Admittedly rhetorically, Defendant now asks:  (1) how could this happen?  (2) was there evidence Defendant was drunk at the time?   (3) was there evidence Defendant was otherwise under the influence of drugs at the time?  (4)  was there evidence Defendant wanted to be arrested, or eventually incarcerated, at the time?  (5) was there evidence Defendant was suffering from some severe mental episode at the time?

The answers, of course, are obvious:  (1) there can be no explanation inferred from the evidence as to why the Defendant, who had no valid driver's license at the time, would blatantly commit a civil infraction in full view of police officers traveling in a marked patrol vehicle;   (2), (3), (4), and (5):  "No."

The Report and Recommendation not only does not address these questions, but even more crucially, attributes Trooper Walters' lack of corroboration not to the nonsensical nature of Trooper Ross's version of events, but to Trooper Walters'

difficulty recalling them.        (Report and Recommendation, page 11.)

Indeed, also crucially, the Report and Recommendation comes to this conclusion in direct opposition to Trooper Walters' testimony that "we did not pass him," and "we did not make a U-turn" to pursue him.  (Dkt. 27, Tr. 6/6/14. P. 20.)

Trooper Walters, in short, did not claim any lack of memory, and the Report and Recommendation's assignment of such faulty memory to him is, once again, based upon a *purely speculative supposition*.

The Defendant's credibility should have been favored on this legally recognized credibility factor, and the Report and Recommendation's erroneous treatment of it must also be rectified by this Court.

**3.        Whether something may have interfered with the witness' ability to perceive or remember the events.**   The hearing record was devoid of any evidence from which it might be inferred that "something" occurred that may have interfered with *Mr. Johnson*'s ability to perceive or remember the events that led him to comply with Trooper Ross's command that he stop his vehicle, (albeit, for reasons of personal safety, approximately one-half block to one block beyond the point at which he realized he was being stopped.  [Dkt. 26, Tr. 5/15/14, pp. 25-26. and Dkt. 27, 6/9/14, p. 30]).  His testimony, in fact, was detailed about those events, and once again, it is undisputed that he was not under the influence of any alcohol or drugs at the time of the stop.

8

Similarly, no evidence of any significance regarding this factor was received at the hearing, in terms of anything that may have interfered with, or distracted, either Trooper Ross or Trooper Walters.  (Had any such evidence been admitted, particularly with respect to Trooper Walters, the Magistrate Judge's supposition that he "may have been looking the other direction" *might* have had some evidentiary basis.)

Thus, but for Trooper Walters' contradiction of Trooper Ross's claims that (1) their patrol vehicle "passed" Defendant's vehicle "as he rolled through" the Cooper-Wisner stop sign, and (2) that a U-turn by Trooper Ross was required in order to pursue Defendant's vehicle, all of the hearing witnesses would be entitled to receive the same credibility assessments.  The contradiction, however, lessens Tpr. Ross's credibility, when compared to the Defendant's.

4.        . . . **the appearance of the witness while testifying.**   The Report and Recommendation is devoid of any findings regarding whether any relative assessment was made concerning the respective "appearances" of the hearing witnesses.  Presumably, therefore, all of the witnesses were found to have given credible "appearances," and nothing about Mr. Johnson's appearance reflected negatively on his credibility.

**5.        Whether the witness had a stake in the outcome of the case, any bias or prejudice, or any reason to lie or slant the testimony in favor of one side or**

**the other; (6) whether the witness testified inconsistently and, if there was an inconsistency, whether the inconsistency was about something important, and; (7) how believable the witness' testimony was in light of all the other evidence.**

In contrast to factors (1) through (4), this factor received particularly significant attention in the Report and Recommendation, *but that attention was exclusively fixed upon the <u>defendant's</u> "stake in the outcome."* Nowhere in the Report is it even mentioned that Trooper Ross's assignment, on the night of Defendant's traffic stop, to something *he* called "Flint City Detail" (which <u>is</u> mentioned) actually involved the task of performing "Proactive Directed Patrol," i.e., in "specified areas" within the City of Flint. (Dkt. 26, Tr. 5/15/14, pp. 23-24, and Dkt. 27, 6/9/14, p. 15.) Nor is it mentioned that the intersection of Wisner and Cooper Streets, as well as the intersection of Wisner Street and Myrtle Ave, are located within the "Directed Patrol 'hot spots'" he and Tpr. Walters were patrolling. (Dkt. 26, Tr. 5/15/14, pp. 24-25.)

Also absent from the Report and Recommendation is any mention of the fact that Trooper Ross testified that these "proactive directed patrol/strict traffic enforcement 'hot spots'" also just happened to be located in areas most troubled by violent crimes and higher crime rates, (which would include, of course illegal gun possession). (Dkt. 26 Tr. 5/15/14, p. 23-24.)

10

Consequently, no attention is given in the Report and Recommendation to the possibility that Trooper Ross, while "proactively patrolling" the "hot spot" in which he observed Mr. Johnson driving, at 1:48 a.m. on the night in question, "may have" decided to conduct an investigatory traffic stop of Mr. Johnson, notwithstanding the fact that he had not committed any traffic violation at all.   For the Report and Recommendation to have done so, of course, would have been to engage in the kind of speculation that the Defendant concedes would have been improper *in the absence of any evidentiary support*.   But the fact that it was established during the hearing that Troopers Ross and Walters were in the habit of conducting 30 traffic stops per shift, (Dkt. 27, Tr. 6/9/14, p. 14), certainly could have lead the Magistrate Judge to infer that one or more of those stops, on any given night, were *not* premised on an observed traffic violation.

Clearly, the Magistrate Judge was unwilling to draw any such inference, and Mr. Johnson does not claim that it was erroneous to take that position.  The point to be made, however, is that the Report and Recommendation *was* willing to infer that Trooper Walters' *contradiction* of Trooper Ross regarding the latter's claim the Defendant rolled through the Wisner-Cooper Stop sign "[as they] passed" him, (Dkt. 27, Tr. 6/9/14, p. 9), was "explained" by the possibility that Trooper Walters' was looking in another direction.  Moreover, the Report and Recommendation was *also* willing to infer that Trooper Walters' *contradiction* of Trooper Ross regarding the

11

latter's need to make a U-turn in order to pursue Defendant was attributable to Trooper Walters' "difficulty recalling" the events.

Crucially, no evidentiary support existed to support either of these propositions, whereas the fact that Trooper Ross habitually conducted 30 traffic stops per shift could certainly have raised a legitimate suspicion regarding Trooper Ross's "credibility," in terms of the legitimacy of any one of those stops, including Defendant's.

In short, for the Report and Recommendation to reference not a single potential "bias" or "stake in the outcome" on the part of Trooper Ross, (despite the Defendant's urging, in his Reply to the Government's Supplemental Brief, [Dkt. 30, p. 20], to consider a variety of such potential biases), suggests that no amount of inconsistency in Trooper Ross's testimony, (either with Trooper Walters' testimony, or arising out of his own dubious claim that Mr. Johnson, who was driving without a valid driver's license, blatantly rolled through a stop sign while in full, known view of a marked Michigan State Police patrol vehicle), would have been sufficient to call Trooper Ross's "credibility" into question.

Turning to the Report and Recommendation's basis for finding the Defendant's credibility fatally flawed, the Report and Recommendation also would appear deficient. Specifically, the Report and Recommendation finds no lack of *internal* consistency between the Defendant's testimony and the other proofs adduced at the

hearing.   (While the Report and Recommendation correctly notes [1] that Trooper Ross's testimony contradicted that of the Defendant regarding the Cooper-Wisner stop sign, and [2] that Troopers Ross and Walters both contradicted the Defendant regarding the Wisner-Myrtle stop, it is the Defendant's position, as will be treated fully in "Objection 2," that the second stop is without any relevance to the question currently before the Court.   To the point made here, however, the only inconsistency in Defendant's testimony mentioned by the Report and Recommendation are these two *external* inconsistencies.)

Instead, the Report and Recommendation, in essentially discarding Defendant's testimony regarding the Cooper-Wisner stop sign, relies almost exclusively on *his* "stake in the outcome" − if convicted, he faces a long period of incarceration.  By that standard, however, no "relative credibility" determination would ever be appropriate, and in suppression hearings, especially, credibility assessments utilizing "factors" would be similarly inappropriate.   Even the Report and Recommendation, however, makes no such claim, and in fact purports, at p. 9, to recognize the propriety of utilizing the Sixth Circuit Pattern Instruction §1.07 factors. It is the Report and Recommendation's failure to address them, and then to apply them fully, that renders the ultimate recommendation − that Defendant's motion be denied − erroneous. That recommendation, Defendant respectfully avers, should be rejected by this Honorable Court, in favor of an Opinion and Order Granting the Motion.

13

Alternatively, Defendant respectfully requests, in accordance with Fed. R. Civ. P. 72 (b)(2) and (3), that this Honorable Court will determine de novo the findings and conclusions set forth in the Report and Recommendation issued September 5, 2014; that it will modify, in accordance with subsection (3), the Reports' recommended disposition; or that it will either authorize the receipt of further evidence, and/or return the matter to the Magistrate Judge with instructions as it deems fit.

**Objection 2**. **The Report and Recommendation concerning Defendant's motion to suppress misapprehends the "submission" prong of the applicable 2-prong test of what constitutes a fourth amendment seizure, in the context of a traffic stop.**

At page 6, the Report and Recommendation entered in this case contains the following passage:

> [An] issue relevant to the facts of this case is when, for Fourth Amendment purposes, a person is "seized" by a police officer. A person is "seized" under the Fourth Amendment when a police officer "arrests" the person. "An arrest requires *either* physical force ... *or*, where that is absent, *submission* to the assertion of authority." *California v. Hodari* D., 499 U.S. 621, 626 (1991). (emphasis in original) (subject not seized until tackled by police officer after chase). There is "no seizure without actual submission; otherwise, there is at most an attempted seizure." *Brendlin v. California*, 551 U.S. 249, 254 (2007). (passenger seized following traffic stop where passenger did not attempt to leave scene thereby demonstrating "passive acquiescence" to show of authority).

In so stating, the Report and Recommendation correctly recognizes that the test for determining whether a citizen has been seized, for Fourth Amendment purposes, is comprised, essentially, of two "prongs." First, there must be "an assertion of

14

authority" by a policeman (or other state actor), and, second, there must be, on the part of the citizen, an act of "submission to the assertion of authority."

With respect, however, Defendant asserts that the Report and Recommendation wrongly concludes that, in the context of a traffic stop, *nothing* short of bringing a vehicle to a *complete stop* will suffice as the required act of submission which, following the requisite show of authority, will complete the "seizure."  No legal authority is cited for this absolutely stated proposition, however, either in the Report and Recommendation, itself, or in any of the Government's briefing on this particular issue.

Further, and perhaps more important to an appreciation of the Defendant's position here, the Report and Recommendation also misapprehends Defendant's argument regarding what constitutes a "completed" seizure.  At page 14, the Report and Recommendation flatly characterizes the Defendant's contention as one "that the activation of the emergency lights was a sufficient show of authority, when there is no flight following the show of authority, to find that Defendant was seized at that point."  Defendant's actual contention here, however, is that this characterization is only partly accurate and, as a consequence, it is not a fair characterization of the Defendant's essential argument, to wit:   that it is *both* the "show of authority" *and* the act of yielding to it that completes the seizure.

The more fundamental question, however, is: what constitutes "submission?" As to that question, the Report and Recommendation says, essentially, submission does not occur in a traffic stop situation until "the car is 'put in park'." Defendant contends, on the contrary, that once a driver perceives that he or she is being made the subject of a traffic stop, he or she yields to the show of authority by (a) slowing down, (b) identifying a safe location to bring his or her vehicle to a stop, and then (c) proceeding, safely, to that location, all *before* (d) putting the car 'in park'."

By all accounts, that is exactly the process followed by Mr. Johnson in the instant case.[1] The Report and Recommendation, however, premises its ultimate conclusion that Defendant was not "seized" until he *completed* the process, and no controlling legal authority is cited (or to Defendant's knowledge, exists) to support that premise.

Instead, Defendant would emphasize, *clear* legal authority exists for the following propositions: (1) A person is "seized" when an officer, by means of physical force or show of authority, has in some way restrained his liberty, such that,

---

[1] If, at <u>any</u> point during this process of yielding to Trooper Ross' "show of authority," Defendant had made any attempt to flee, then the process would rightly be considered as having been interrupted. And the "submission" prong of a constitutional seizure would have been absent in this case. That he did not do so (again by all accounts) is clearly relevant, and the Report and Recommendation's statement that "none of [the cases relating to when a fleeing suspect is seized for Fourth Amendment purposes] state that flight is a necessary predicate to the determination that a person has not submitted to a show of authority" might be considered pertinent, but only if Mr. Johnson <u>had been</u> a fleeing suspect. But just as "none of [the cases relating to when a fleeing suspect is seized for Fourth Amendment purposes] state that flight is a necessary predicate to the determination that a person has not submitted to a show of authority," (Report and Recommendation, pages 15-16), neither is there any known legal authority which holds that a driver who perceives he or she is *in the process* of being made subject to a traffic stop "fails to submit" to such a show of authority when he or she immediately *initiates the process* of stopping his or her vehicle, i.e., by immediately slowing the vehicle, identifying a safe place to bring it to a stop, and then *in fact* bringing it to a stop.

in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave, *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975 (1988); and *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868 (1968); and (2) regarding the requirement that a person must "yield" to an official show of authority, "what may amount to submission depends on what a person was doing before the show of authority . . . ." *Brendlin v. California*, 551 U.S. 249, 254, ___ S.Ct. ____ (2007).

Even the Government does not challenge the first proposition, and the Report and Recommendation's failure to recognize the second bespeaks an underlying failure to acknowledge that each case must be assessed on the basis of its own, unique set of facts. (*See also* <u>Chesternut</u>, at 486 U.S. 573 [liberty is restrained when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave]."

Employing that requisite assessment here, it is undisputed that "what Mr. Johnson was doing before" Trooper Ross's "show of authority," (i.e., before he rapidly approached Mr. Johnson, from behind, and activated his "overheads"), was simply driving his vehicle home from his place of employment, and essentially "minding his own business." No dispute exists, further, that Mr. Johnson realized he was being "pulled over," (and therefore "reasonably believed he was not free" to just continue driving), when he observed Trooper Ross's actions. Finally, Mr. Johnson

17

immediately submitted to Trooper Ross's show of authority, by *initiating the process* of safely bringing his vehicle to a safe stop, and at a safe place.  Thus, when he initiated that process, he was, in a constitutional sense, "seized," and nothing that occurred *subsequent* to that seizure can validly be posited as serving as constitutional grounds to effect that initial seizure.

In other words, the second civil infraction at issue here — "The Wisner-Myrtle Incident," referenced at page 30 of the Report and Recommendation — did not constitute any "failure to submit" to Trooper Ross's show of authority, nor did it serve, in any respect, as the basis for Mr. Johnson's initial "seizure," *which had already occurred*.

To demonstrate the logical soundness of Defendant's argument, the Court is urged to consider a hypothetical, but nonetheless analogous situation.   Specifically, suppose that Mr. Johnson had been traveling in the center lane of a busy, three-lane freeway when Trooper Ross observed him driving a black SUV.  Suppose, further, that Trooper Ross became suspicious of Mr. Johnson — possibly because the SUV was registered to a woman, or because Mr. Johnson did not appear to be a person able to afford such a vehicle, or possibly for any number of other "reasons" — and decided to initiate a traffic stop of Mr. Johnson, i.e., by pulling up close behind him and  activating his "overheads."  Suppose, as well, that when Mr. Johnson noticed he was being "pulled over," he initiated the process of yielding to this apparent

18

command by gradually slowing, then moving into the next lane of traffic, nearer to the "shoulder" of the road on which he planned to bring his vehicle to a stop, *but doing all this without using his turn signal — thus committing a clear and indisputable traffic violation*.

In these circumstances, would the Government argue — *could it logically argue*, that Mr. Johnson's signal-less lane change amounted to a legal predicate for Trooper Ross's *initiation* of the traffic stop?  And if the Government had the audacity to make such an argument, would this Court — *could this Court* — in good conscience honor the argument by ruling in favor of it?

These are rhetorical questions, of course, but Mr. Johnson logically and reasonably asserts that they — and their obvious "no" answers — clearly illustrate the point that a person "yields" to a traffic patrol officer's "show of authority," commanding that a vehicle "pull-over," not by *completing* the process of stopping the vehicle, but instead by initiating that process, and then carrying it through to completion in a safe and compliant manner.

Finally, if "traffic stop seizure" cases can, like other constitutional "seizure" cases, be fairly summarized as holding that the two "prongs" of a seizure are (1) a show of authority, and (2) a Defendant's submission to it, then Mr. Johnson was constitutionally "seized" well before he allegedly "ran" the Wisner–Myrtle stop sign.

On that basis, "The Wisner-Myrtle incident" should not have been treated by the Report and Recommendation as having any relevance at all, and the only question the Report and Recommendation should have addressed is whether, on balance, the Government submitted evidence at the hearing that *preponderated* in favor of a finding that Mr. Johnson, in fact, "rolled through" the stop sign at Cooper and Wisner Streets.

Because Defendant believes, for the reasons set forth s*upra*, that the Report and Recommendation also answered that question erroneously, he respectfully prays, in accordance with Fed. R. Civ. P. 72 (b)(2) and (3), that this Honorable Court will determine de novo the findings and conclusions set forth in the Report and Recommendation issued September 5, 2014; that it will reject or modify, in accordance with subsection (3), the Report's recommended disposition; or, in the alternative, that it will either authorize the receipt of further evidence, and/or return the matter to the Magistrate Judge with such instructions as it deems fit.

Respectfully submitted,


Dated: September 15, 2014          s/Glenn M. Simmington
                                   GLENN M. SIMMINGTON  P33626
                                   Attorney for Defendant
                                   503 S. Saginaw Street, Ste. 1000
                                   Flint, MI  48502
                                   (810) 600-4211
                                   simmingtonlaw@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 18th day of September, 2014, the foregoing Objection were filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: September 18, 2014        s/Glenn M. Simmington
                                          GLENN M. SIMMINGTON  P33626
                                          Attorney for Defendant
                                          503 S. Saginaw Street, Ste. 1000
                                          Flint, MI  48502
                                          (810) 600-4211
                                          simmingtonlaw@gmail.com